Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 1 of 53

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RENSSELAER

------------------------------------------------------------------------x

JANE DOE,

                     Plaintiff,

-against-

SUPER HOST HOTELS, INC. d/b/a RAMADA PLAZA
BY WYNDHAM, WYNDHAM HOTELS & RESORTS,
INC., CORPORATION 123 d/b/a RAMADA PLAZA BY
WYNDHAM, EXTENDED STAY AMERICA, INC.,
ESA MANAGEMENT, LLC d/b/a EXTENDED STAY
AMERICA, CORPORATION 456 d/b/a EXTENDED
STAY AMERICA, MARRIOTT INTERNATIONAL,
INC., MARRIOTT HOTEL SERVICES, INC.,
W2005/FARGO HOTELS REALTY, L.P. d/b/a
TOWNEPLACE SUITES BY MARRIOTT,
CORPORATION 789 d/b/a TOWNEPLACE SUITES BY
MARRIOTT AND HAROLD NELSON,

                     Defendants.

------------------------------------------------------------------------x

Index No.:

**VERIFIED COMPLAINT**

**JURY TRIAL DEMAND**

Plaintiff Jane Doe, by her attorneys, The Law Firm of Andrew M. Stengel, P.C., 11 Broadway, Suite 715, New York, New York, 10004, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiff Jane Doe is a resident of the County of Rensselaer.

2.      According to the U.S. Department of Homeland Security, "Trafficking is a huge and thriving business, yielding an estimated $32 billion in illicit profits each year."[1]

3.      Sex trafficking enterprises brazenly operate in and out of hotels throughout this country. Sex traffickers parade their misconduct openly on hotel properties throughout the United

---

[1]United States Department of Homeland Security, *Human Trafficking – modern day slavery*, https://www.ice.gov/news/releases/using-financial-attack-strategy-combat-human-trafficking.

States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, rights and dignity.

4.      The hotel Defendants named herein knew and/or should have known that sex trafficking repeatedly occurs and occurred under the flag of their respective brands in New York and throughout the country. Rather than taking timely and effective measures to thwart the epidemic of sex trafficking, the hotels have chosen to ignore the open and obvious presence of sex trafficking on their properties and enjoy the profits from rooms rented for this explicit and apparent purpose.

5.      This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified as Jane Doe, under the federal Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA"), 18 U.S.C. § 1595, and New York State's Trafficking Victims Protection and Justice Act, codified at Social Services Law § 483-bb(c).

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Jane Doe, a female, is a resident of the County of Rensselaer.

7.      Plaintiff brings this action under a pseudonym because of the sensitive nature of the allegations of sex trafficking and sexual assault in this Complaint, which are matters of the utmost intimacy. Plaintiff fears embarrassment and further psychological damage if her identity as a victim of sex trafficking and sexual assaults were to become publicly known.

8.      At all relevant times, Defendant Super Host Hotels, Inc. d/b/a Ramada Plaza by Wyndham was and is a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York with a business address of 1101 Harbor Road, Hewlett, NY 11557.

9.      At all relevant times, Defendant Super Host Hotels, Inc. d/b/a Ramada Plaza by Wyndham was and is a business entity doing business in the County of Nassau, State of New York, .

3

10.     At all relevant times, Defendant Wyndham Hotels & Resorts, Inc. was and is a foreign corporation duly authorized to do business in the State of New York and/or doing business in the State of New York.

11.     Defendant Wyndham Hotels & Resorts, Inc. is the successor in interest to Wyndham Worldwide Corporation.

12.     Upon information and belief, Defendant Wyndham Hotels & Resorts, Inc. assumed the obligations and liabilities of the former corporation, expressly or impliedly assumed Wyndham Worldwide Corporation's legal liabilities, and/or is a mere continuation of Wyndham Worldwide Corporation.

13.     At all relevant times, Defendant Corporation 123 d/b/a Ramada Plaza by Wyndham, a fictitious name not yet known to Plaintiff, owned, managed and/or operated the Ramada Plaza by Wyndham.

14.     At all relevant times, Defendant Corporation 123 d/b/a Ramada Plaza by Wyndham was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

15.     Defendants Super Host Hotels, Inc. d/b/a Ramada Plaza by Wyndham, Wyndham Hotels & Resorts Corporation and Corporation 123 d/b/a Ramada Plaza by Wyndham are hereinafter collectively known as the "Wyndham Defendants."

16.     At all relevant times, the Wyndham Defendants owned, managed, controlled and/or operated the Ramada Plaza by Wyndham located at 3 Watervliet Avenue Extension, Albany, NY 12206.

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML Document 2 Filed 03/20/26 Page 4 of 53

17. At all relevant times, the Wyndham Defendants, pursuant to a franchising agreement, owned, managed, controlled and/or operated the Ramada Plaza property where Plaintiff was sex trafficked.

18. At all relevant times, Defendant Extended Stay America, Inc. was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

19. At all relevant times, Defendant ESA Management, LLC d/b/a Extended Stay America was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

20. At all relevant times, Defendant Corporation 456 d/b/a Extended Stay America, a fictitious name not yet known to Plaintiff, owned, managed, controlled, and/or operated the Extended Stay America.

21. At all relevant times, Defendant Corporation 456 d/b/a Extended Stay America was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

22. Defendants Extended Stay America, Inc., ESA Management, LLC d/b/a Extended Stay America Corporation 456 d/b/a Extended Stay America are hereinafter collectively known as the "Extended Stay America Defendants."

23. At all relevant times, the Extended Stay America Defendants owned, managed, controlled and/or operated the Extended Stay America located at 1395 Washington Avenue, Albany, NY 12206.

5

24. At all relevant times, the Extended Stay America Defendants, pursuant to a franchising agreement, owned, managed, controlled and operated the Ramada Plaza property where Plaintiff was sex trafficked.

25. At all relevant times, Defendant Marriott International, Inc. was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

26. At all relevant times, Defendant Marriott Hotel Services, Inc. was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

27. At all relevant times, Defendant W2005/Fargo Hotels Realty, L.P. d/b/a TownePlace Suites by Marriott was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

28. At all relevant times, Defendant Corporation 789 d/b/a TownePlace Suites by Marriott, a fictitious name not yet known to Plaintiff, owned, managed, controlled and/or operated the TownePlace Suites by Marriott.

29. At all relevant times, Defendant Corporation 789 d/b/a TownePlace Suites by Marriott was and is a foreign corporation duly authorized to do business in the State of New York and doing business in the State of New York.

30. Defendants Marriott International, Inc., Marriott Hotel Services, Inc., W2005/Fargo Hotels Realty, L.P. d/b/a TownePlace Suites by Marriott and Corporation 789 d/b/a TownePlace Suites by Marriott are hereinafter collectively known as the "Marriott Defendants."

31. At all relevant times, the Marriott Defendants owned, managed, controlled and/or operated the TownePlace Suites by Marriott located at 1379 Washington Avenue, Albany, NY 12206.

32.     At all relevant times, the Marriott Defendants, pursuant to a franchising agreement, owned, managed, controlled and operated the TownePlace Suites property where Plaintiff was sex trafficked.

33.     Defendant Harold Nelson, who resides in Schenectady County in the State of New York, is the individual who sex trafficked Plaintiff at the hotels named herein.

34.     This Court has jurisdiction over the subject matter of this action and the parties pursuant to CPLR 301.

35.     This Court has jurisdiction over this action because the amount of damages Plaintiff seeks exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

36.     Venue is proper in Rensselaer County pursuant to CPLR 503(a) because Plaintiff resides within the county.

## FACTUAL ALLEGATIONS

**The Hotel Industry's Role in Sex Trafficking**

37.     The hospitality industry plays a crucial role in sex trafficking. The trope of the "no-tell hotel" was not recently coined. Hotels have long profited from their reputations as havens of privacy and discretion for the offending because they offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking.

38.     The hotel Defendants named herein are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking, both directly and indirectly, from sex trafficking that occurs at their properties. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ (*citing* Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

"been able to reap these profits with little risk when attempting to operate within hotels."[3]  In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4]

39.      Recognizing the unique vantage point that hotel owners and staff often have to identify potential sex trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. In order to meet that responsibility, most major hotel chains, like the hotel Defendants named herein, have adopted robust anti-sex trafficking policies to train their employees to identify and properly respond to the "red flags" of sex trafficking.

40.      All Defendants named herein had the opportunity and responsibility to adopt, implement and enforce similar policies at their hotels.

41.      Unfortunately for Ms. Doe, such policies were not in place or were not enforced at their hotels.

42.      According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

43.      Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted and forced to service buyers who come to the hotel solely to purchase sex from sex trafficking victims.

---

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry: *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-traffickingvictimslife_us_57714091e4b0f168323a1ed7.
[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

8

44. Due to the overall complacency of the hospitality industry in addressing sex trafficking, hotels are *the* venue of choice for sex trafficking. Sex traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond and/or establish safe and secure reporting mechanisms for those at the point of sale.

45. To address the crisis of sex trafficking at hotels, multiple agencies and organizations that actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[5]

46. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which the hotel Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[6]

    a. Individuals who show signs of fear, anxiety, tension, submission and/or nervousness;

    b. Individuals who show signs of physical abuse, restraint and/or confinement;

    c. Individuals who exhibit evidence of verbal threats, emotional abuse and/or being treated in a demeaning way;

---

[5] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors; Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.
[6] *See id.*

d.     Individuals who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries and/or unusual behavior;

e.     Individuals who lack freedom of movement or are constantly monitored;

f.     Possession or use of large amounts of cash or pre-paid cards.

g.     Individuals who avoid eye contact and interaction with others;

h.     Individuals who have no control over or possession of money or identification;

i.     Individuals who dress inappropriately for their age or have lower-quality clothing compared to others in their party;

j.     Individuals who have few or no personal items—such as no luggage or other bags;

k.     Individuals who appear to be with a significantly older "boyfriend" or in the company of older males;

l.     A group of women who appear to be traveling with a male;

m.     A group of men or women who have identical tattoos in similar locations, which may indicate "branding";

n.     Drug abuse or frequent use of heroin;

o.     Frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), methamphetamines, Cocaine and Marijuana;

p.     Possession of bulk sexual paraphernalia such as condoms or lubricant; and

q.     Possession or use of multiple cell phones.

47.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation and trafficking where it is most likely to occur.

10

48. Aside from their unique position in this epidemic, hotels also have one of the highest obligations to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to do so. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[7]

49. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry to help hotel staff in every position to identify the signs.

50. From check-in to check-out, there are a number of indicators that sex traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

51. The hospitality industry has been cognizant of its role and responsibilities in the sex trafficking industry for decades.

52. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[8] and domestically in 2010 with the Department of Homeland Security's Blue Campaign. These efforts sought to educate both the public and private

---

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), p. 1, https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.
[8] *See Human trafficking: the facts*, United Nations Office on Drugs and Crime, https://www.unodc.org/documents/blueheart/Fact_sheet_english.pdf.

11

sectors on identifying and combating human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.

53.    Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly failed to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and increase the bottom line.

54.    Hotel brands or flags often lend their name and likeness to third-party owners, while the building and operations are run by a franchisee or third-party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract or membership agreement and still profits from putting heads in beds.

55.    However, the average consumer is not aware of this relationship. The parent brand gives the franchisee property its entire identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, then they can expect the standards consistent with the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens in the bedside tables to the staff uniforms at the front desk.

56.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, an 800 number, revenue management tools, world-class loyalty programs and a website. This is so that booking and room reservations, the source of profits for the entire industry, are controlled by the corporate parent brand.

57.    The franchise hotel typically pays approximately 10% of its total revenue back to the parent hotel brand and is required by the brand to develop and maintain the property in accordance with the parent hotel brand's standards, as they are laid out in the franchise agreement.

58.    At the time of the incidents alleged herein, the hotel Defendants named herein knew or should have known that illegal activities, including sex trafficking ventures, were taking place on the hotel properties where Plaintiff was sex trafficked.

59.    While parent hotel brands may expel delinquent hotels from of their system, they seldom do because doing so comes at the expense of terminating royalty payments. Even an inadequate or dangerous hotel under the parent hotel brand's flag generates more revenue than no hotel.

60.    Per the franchise agreement, the parent brand may enforce these standards through periodic audits, inspections and termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce its brand standards is also its responsibility.

**Franchisee Hotel Defendants Were Required to Report Sex Trafficking to the Hotel Franchisor Defendants**

61.    The relationships between the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels were governed by franchise agreements.

62.    At all relevant times, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants had robust reporting requirements in place for their franchisees, their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels.

13

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML Document 2 Filed 03/20/26 Page 13 of 53

63. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants require their franchisees, the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, to report all suspected instances of crime at their properties.

64. Based on information observed by the staff, reports should have been made to the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants about the sex trafficking of Ms. Doe.

65. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants exercised pervasive and systematic control over the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels.

66. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants exercised an ongoing and systemic right of control over the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels.

67. At all relevant times, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants were subject to and required to comply with franchise agreement standards, policies and rules adopted by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants. These standards and policies are detailed and control the specific manner and means by which its franchisees, the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, must operate the hotels.

68. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants require their franchisees, the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, to report all suspected instances of sex trafficking at their properties.

69. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants required their franchisees, the Ramada-, Extended Stay America- and TownePlace Suites-

14

branded franchise hotels, to allow the Wyndham Defendants, the Extended Stay America Defendants to regularly inspect their hotels.

70. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants regularly inspected their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels.

71. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants required their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels to adhere to strict requirements, including but not limited to:

    a. Standardized training methods for employees;

    b. Building and maintaining the hotels in a manner specified by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants;

    c. Standardized or strict rules of operation for the hotels;

    d. Regular inspection of the hotels and their operation by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants;

    e. Prices fixed by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants;

    f. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants  provided online booking platforms;

    g. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants established reporting requirements for the hotels; and

    h. Other actions that deprived their branded franchise hotels of independence in their business operations.

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 15 of 53

72.     The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants specifically retained control over the day-to-day operation of their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels concerning aspects of operation of the hotels that caused Plaintiff's harm, including but not limited to reservation policies and procedures, staff training, security policies and training, education policies and procedures concerning sex trafficking.

73.     The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants regularly advised their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels on operational changes necessary for them to remain in compliance with the strict regulations of the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants.

74.     The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants had the ability to impose fees or fines on their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels. Furthermore, at all material times, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants retained an absolute right to cancel its franchise agreements with the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels if the rules of the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants were violated or if their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels otherwise failed to comply with its contractual obligations.

75.     At all relevant times, the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels acted as the agent of the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants.

16

76. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels shared control of the terms and conditions of the employment of staff and, therefore, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels were joint employers.

77. Upon information and belief, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants exercised control over the terms and conditions of employment of staff at the hotels at issue.

78. Therefore, as a result of the strict reporting requirements, at all material times, all Defendants knew or should have known of their facilitation of sex trafficking at the subject hotels, including the facilitation of the sex trafficking of Plaintiff.

**The Willful Blindness to Sex Trafficking at Defendants' Hotels**

79. Defendants have been on notice of repeated incidences of sex trafficking occurring at their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, yet these owners, franchisors, franchisees, brand managers and/or supervisors failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

80. Upon information and belief, despite knowledge of the problem of sex trafficking in their hotels, Defendants did not require that employees participate in training to recognize, report and prevent sex trafficking.

81. At all relevant times, the hotel Defendants named herein owned, operated, managed, supervised, controlled and/or were responsible for the operations of the subject hotels.

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
NYSCEF DOC. NO. 1
INDEX NO. EF2026-282116
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 17 of 53

82. Defendants acted jointly to rent rooms at the subject hotels, with the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants retaining control over reservation systems and policies, training and protocols as further described in this Complaint.

83. Defendants were jointly responsible for customer safety and, specifically, the prevention of sex trafficking at the hotels. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants retained control over, and thus had a duty with respect to, customer safety at the hotels generally and specifically regarding detection of and response to sex trafficking at the hotels.

84. Armed with knowledge of the prevalence of trafficking in the hotel industry, at hotels across the country, and the signs present at the subject hotels, all Defendants had an obligation to enact, implement, follow and enforce policies to identify sex trafficking and not to participate in or benefit from the facilitation thereof.

85. All Defendants failed to do so and thus facilitated sex trafficking that operated out of the hotels.

86. The most effective weapon against sexual exploitation and sex trafficking is education and training. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."[9]

---

[9] ECPAT USA, *Training for Hotel Associates,* https://www.ecpatusa.org/hotel-training.
*See also* Carolin L. et al*., Sex Trafficking in the Tourism Industry, J. Tourism Hospit.* (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

18

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 18 of 53

87.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

88.     If the Defendants had adequately trained and implemented guidelines, "red flags," training, policies and procedures, and other recommendations adopted in the industry, all Defendants would have or should have known of Plaintiff's trafficking and would have been in a position to prevent the trafficking of Plaintiff.

89.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens—and are more willing to report it—than those who have not been trained.[10]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

90.     The "red flags" and signs of a sex trafficking venture described above were observed by the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels. Upon information and belief, the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels should have reported the signs of sex trafficking to the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants.

---

[10] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking.

19

91.    If the hotel Defendants named herein educated and/or trained their actual or apparent agents, servants, franchisees, employees and/or staff regarding sex trafficking and their warning signs, then their actual or apparent agents, servants, franchisees, employees and/or staff would have more aware of sex trafficking taking place at their hotels and could have, at best, prevented it from happening or, at worst, been more willing to report it when it happened.

92.    All Defendants' active decisions not to prevent and stop sex trafficking and sexual exploitation at their hotels make them accountable to victims of sex trafficking, including Plaintiff.

93.    Thus, all Defendants engaged in an act or acts and omissions that supported, facilitated, harbored and otherwise furthered the sex trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

94.    More specifically, the Defendants rented rooms to Plaintiff's sex trafficker, permitted their illicit enterprise to operate on an ongoing and repetitious basis, and took no action to abide by the self-imposed anti-trafficking measures of the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants. This and related behavior by Defendants provide an ample basis to conclude that they participated in the venture that trafficked Plaintiff.

95.    The motivation behind all Defendants' ongoing willful blindness and ongoing failure to act is plain and simple: limitless corporate greed.

96.    All Defendants ignored all of the signs of and/or solutions to sex trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

**The Hotel Defendants Knowingly Benefitted from Sex Trafficking**

97.    Plaintiff alleges that all Defendants knowingly received benefits from participating in the venture that facilitated the trafficking of Ms. Doe.

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 20 of 53

98. As a result of the strict reporting requirements at all relevant times, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants knew they were facilitating and benefitting from sex trafficking at the hotels, including the sex trafficking of Ms. Doe.

99. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants generate substantial income from the operations of hotels.

100. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants received a share of the profits from room rentals collected by the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels.

101. The primary source of income for the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants is the franchising royalty fee, but the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants also profit from reservation fees, marketing fees, loyalty program fees and other miscellaneous ancillary fees, as described in the franchise documents. The fees generated by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants are primarily based on gross room rentals; therefore, the profits increase with each room rental of the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants.

102. The branded franchise hotels, as franchisees, profited from every stay by every patron at their hotels, both from room rentals and other hotel services.

103. Upon information and belief, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants knowingly benefitted from their participation in the sex trafficking venture carried on at the hotels in that they received a portion of the proceeds collected by their franchisee.

104.     Therefore, at all material times, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and the Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels received monetary payment for the rental of rooms at the hotels, including the rooms where Plaintiff was being trafficked.

105.     Despite knowledge of the sex trafficking venture occurring, both the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels continued to financially benefit from Plaintiff's stays, all while doing nothing to prevent or stop criminal activity-sex trafficking, including the trafficking of Plaintiff, from occurring on their property.

106.     As a result of the monies paid by Plaintiff's sex trafficker to the secure rooms for her trafficking, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels knowingly benefitted from participating in the venture that trafficked, harbored and maintained Plaintiff's trafficking.

107.     The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants were on notice of repeated incidences of sex trafficking occurring at their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels respectively, yet these owners, franchisors, franchisees, brand managers and/or supervisors failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

108.     Upon information and belief, despite knowledge of the problem of sex trafficking in their hotels, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott

Defendants did not require that employees participate in training to recognize, report and prevent sex trafficking.

109.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants:

a.    Failed to implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked;

b.    Failed to implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked;

c.    Failed to implement and enforce any policies and protect Plaintiff from being sex trafficked;

d.    Knew or should have known that the respective hotels where Plaintiff was sex trafficked were areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff was trafficked;

e.    Despite having knowledge of the extensive prostitution and sex trafficking that occurred and occurs at their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, they repeatedly failed to stop these actions.

110.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants could have exercised control over their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels by:

a.    Distributing information to assist employees in identifying sex trafficking;

b.    Providing a process for escalating sex trafficking concerns within the organization;

c.    Requiring employees to attend training related to sex trafficking;

23

Case 1:26-cv-00443-MAD-ML   Document 2   Filed 03/20/26   Page 23 of 53

d.      Providing new hire orientation on human rights and corporate responsibility;

e.      Providing training and education to their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels through webinars, seminars, conferences and online portals;

f.      Developing and holding ongoing training sessions on sex trafficking; or

g.      Providing checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on sex trafficking prevention.

**Plaintiff Jane Doe was Sex Trafficked at Ramada Plaza by Wyndham**

111.     From about July 2015 to about December 2016, Plaintiff was trafficked for sex at the Ramada Plaza by Wyndham located at 3 Watervliet Avenue Extension, Albany, NY 12206.

112.      Defendant Nelson openly sex trafficked Plaintiff at the Ramada Plaza.

113.     Defendant Nelson rented two rooms at the Ramada Plaza, paying in cash, for the duration of the sex trafficking of Plaintiff.

114.     Plaintiff's sex trafficker paid for and held two rooms at the Ramada Plaza, one where the sex trafficking occurred and another primarily where Plaintiff and the other victims of sex trafficking slept.

115.     Other women were being trafficked at the same hotel at the same time as Plaintiff and she shared a room with other female victims of sex trafficking.

116.     There were month-long occasions when Defendant Nelson paid for and held a third room where he sex trafficked approximately five women.

24

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 24 of 53

117. Defendant Nelson publicly advertised "dates" with Plaintiff and the other women he sex trafficked on such websites as backpage.com, craigslist.com, sugarnights.com and theeroticreview.com.

118. Plaintiff accepted cash payments from the men with whom she was forced to engage in sexual acts with.

119. Defendant Nelson monitored the room where Plaintiff was sex trafficked and took the cash payments from Plaintiff and the other women he sex trafficked.

120. Defendant Nelson used force and engaged in a scheme, plan and pattern to compel and induce Plaintiff to engage in and continue to engage in prostitution activity by means of instilling fear in Plaintiff through acts of violence and threats of acts of violence.

121. Throughout the sex trafficking of Plaintiff at the Ramada Plaza, Plaintiff was subjected to threats of violence and physical violence every few weeks, which included physical strikes and strangulation, by her sex trafficker, Defendant Nelson.

122. Defendant Nelson supplied Plaintiff and the other women who were being sex trafficked heroin daily so that they continued to be sex trafficked.

123. Throughout the sex trafficking of Plaintiff at the Ramada Plaza, Plaintiff was frequently raped by her sex trafficker, Defendant Nelson.

124. In or about the fall of 2015, Plaintiff fled the Ramada Plaza.

125. A few days later, a man hired by Plaintiff's sex trafficker found Plaintiff at another hotel and threatened Plaintiff with a handgun, causing Plaintiff to return to Ramada Plaza, where she was forced to continue to be sex trafficked.

126. In or about the summer of 2016, Plaintiff fled the Ramada Plaza a second time.

127. A few days later, a man hired by Plaintiff's sex trafficker found Plaintiff at another hotel and threatened Plaintiff with a handgun, causing Plaintiff to return to Ramada Plaza, where she was forced to continue to be sex trafficked.

128. There was heavy foot traffic in and out of Plaintiff's room involving men who were not hotel guests.

129. Between 5 and 15 men who were not hotel guests went in and out of Plaintiff's room daily for the purpose of engaging in sex trafficking.

130. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

131. Housekeeping saw these men come in and out of the rooms.

132. Plaintiff's sex trafficker paid extra money in cash daily to hotel employees to receive extra sheets and towels for the room where Plaintiff was sex trafficked.

133. The general manager of the Ramada Plaza directly participated in Plaintiff's sex trafficking.

134. Defendant Nelson made direct cash payments to the general manager of the Ramada Plaza to facilitate and continue sex trafficking at the hotel.

135. The general manager of the Ramada Plaza directed the hotel staff to cooperate with Plaintiff's sex trafficker.

136. For approximately one year, Defendant Nelson forced another woman who was being sex trafficked to have sex with the general manager of the Ramada Plaza

137. Plaintiff's sex trafficking ended at the Ramada Plaza when police were called to the location.

138. Police directed Plaintiff and other women who were being sex trafficked to leave the hotel.

139. Because policies purportedly enacted and enforced by Wyndham to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Wyndham, Plaintiff's sex trafficker was able to continue the trafficking venture at the Ramada Plaza.

140. If the Wyndham Defendants enforced the policies and procedures it enacted to prevent trafficking from occurring within their Wyndham/Ramada-branded hotels after observing an obvious sign of trafficking as described above, then Plaintiff's trafficking would have been identified and reported, which would have prevented her trafficking at the Ramada.

141. If the Wyndham Defendants properly followed the franchise policies enacted by Wyndham Hotels & Resorts to identify and prevent trafficking from occurring at Ramada-branded hotels as described above, then Plaintiff's sex trafficking would have been identified and reported, which would have prevented her trafficking at the Ramada Plaza.

142. Despite obvious signs of sex trafficking and indicators of commercial sex activity, the Wyndham Defendants failed to recognize, stop, or report the venture occurring on the premises that resulted in Plaintiff's trafficking and consequently, actively facilitated the trafficking venture.

143. Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly benefited, financially and otherwise, from the sex trafficking the Plaintiff suffered.

144. Furthermore, the Defendants failed to prevent her continued victimization.

145. The Wyndham Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject Ramada Plaza, despite the obvious signs of sex trafficking and commercial sex taking place because

the Wyndham Defendants were actively engaged in the facilitation of and benefiting from said activities.

146.    The Wyndham Defendants were in an agency relationship with the Ramada-branded hotels offering public lodging services in the hotel.

147.    This agency relationship was created through the Wyndham Defendants exercise of an ongoing and systemic right of control over Ramada-branded hotels by the Wyndham Defendants; operations, including the means and methods of how Ramada-branded hotels conducted daily business through one or more of the following actions:

a.    Distributing information to assist employees in identifying sex trafficking;

b.    Providing a process for escalating sex trafficking concerns within the organization;

c.    Requiring employees to attend training related to sex trafficking;

d.    Providing new hire orientation on human rights and corporate responsibility;

e.    Providing training and education to Ramada-branded hotels through webinars, seminars, conferences and online portals;

f.    Developing and holding ongoing training sessions on sex trafficking;

g.    Providing checklists, escalation protocols and information to property management staff; and

h.    Tracking performance indicators and key metrics on sex trafficking prevention.

148.    The Wyndham Defendants were in an agency relationship with Ramada-branded hotels offering public lodging services in the hotel.

28

149. This agency relationship was created through the Wyndham Defendants' exercise of an ongoing and systemic right of control over Ramada-branded hotels by the Wyndham Defendants' operations, including the means and methods of how Ramada-branded hotels conducted daily business through one or more of the following actions:

    a.    Hosting online bookings on the Wyndham Defendants' domain;

    b.    Requiring Ramada-branded hotels to use the Wyndham Defendants' customer rewards program;

    c.    Setting employee wages;

    d.    Making employment decisions;

    e.    Advertising for employment;

    f.    Sharing profits;

    g.    Standardized training methods for employees;

    h.    Building and maintaining the facility in a manner specified by the owner;

    i.    Standardized or strict rules of operation;

    j.    Regular inspection of the facility and operation by the owner;

    k.    Fixing prices; or

    l.    Other actions that deprive Ramada-branded hotels of independence in business operations.

150. An apparent agency also exists between the Wyndham Defendants and the Ramada-branded hotels. The Wyndham Defendants held out Ramada-branded hotels to the public as possessing the authority to act on its behalf.

29

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 29 of 53

151.    Due to the Wyndham Defendants' control they assumed in educating, implementing and directing its branded hotels, including Ramada-branded hotels, the Wyndham Defendants breached their duties in the following ways:

a.    Not adequately distributing information to assist employees in identifying sex trafficking;

b.    Failing to provide a process for escalating sex trafficking concerns within the organization;

c.    Failing to mandate managers, employees, or owners to attend training related to sex trafficking;

d.    Failing to provide new hire orientation on human rights and corporate responsibility;

e.    Failing to provide training and education on sex trafficking through webinars, seminars, conferences and online portals;

f.    Failing to develop and hold or require ongoing training sessions on sex trafficking; and

g.    Failing to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on sex trafficking prevention.

152.    The Wyndham Defendants knew or should have known that sex trafficking ventures were occurring on their properties, including the Ramada property where Plaintiff was sex trafficked, but the Wyndham Defendants failed to take any steps to prevent and/or stop the sex trafficking of Plaintiff.

153.     If the hotel staff were properly trained, the sex trafficking red flags would have been recognized and reported. But the Wyndham Defendants chose not to invest the time and resources to implement and execute any anti-sex trafficking programs and/or protocols.

154.     Upon information and belief, the Wyndham Defendants demonstrated willful blindness to the rampant culture of sex trafficking, which tragically occurs on its Ramada-branded properties throughout the country. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff at the Ramada-branded hotel that forms the basis of this complaint.

**Plaintiff Jane Doe was Sex Trafficked at Extended Stay America**

155.     From about January 2017 to or about April 2018, Plaintiff was trafficked for sex at the Extended Stay America located at 1395 Washington Avenue, Albany, NY 12206.

156.     Defendant Nelson openly sex trafficked Plaintiff at the Extended Stay America.

157.     Defendant Nelson rented two rooms at the Extended Stay America, paying in cash, for the duration of the sex trafficking of Plaintiff.

158.     Plaintiff' sex trafficker held two rooms at the Extended Stay America, one where the sex trafficking occurred and another where Plaintiff and the other victims of sex trafficking slept.

159.     Other women were being trafficked at the same hotel at the same time as Plaintiff and she shared a room with other female victims of sex trafficking.

160.     Defendant Nelson publicly advertised dates with Plaintiff on such websites as backpage.com, craigslist.com, sugarnights.com and theeroticreview.com.

161.     Plaintiff accepted cash payments from the men with whom she was forced to engage in sexual acts with.

31

162. Defendant Nelson monitored the room where Plaintiff was sex trafficked and took the cash payments from Plaintiff and the other women whom he sex trafficked.

163. Defendant Nelson used force and engaged in a scheme, plan and pattern to compel and induce Plaintiff to engage in and continue to engage in prostitution activity by means of instilling fear in Plaintiff through acts of violence and threats of acts of violence.

164. Throughout the sex trafficking of Plaintiff at the Extended Stay America, Plaintiff was subjected to threats of violence and physical violence every few weeks, which included physical strikes and strangulation, by her sex trafficker, Defendant Nelson.

165. Defendant Nelson supplied Plaintiff and the other women who were sex trafficked heroin and crack cocaine daily so that they continued to be sex trafficked.

166. Throughout the sex trafficking of Plaintiff at the Extended Stay America, Plaintiff was raped by her sex trafficker, Defendant Nelson, every few weeks.

167. During the time Plaintiff was sex trafficked at the Extended Stay America she fled from the hotel.

168. On one occasion after Plaintiff fled, a man hired by Plaintiff's sex trafficker found Plaintiff at another hotel and threatened Plaintiff with a handgun, causing Plaintiff to return to the Extended Stay America, where she was forced to continue to be sex trafficked.

169. There was heavy foot traffic in and out of Plaintiff's room involving men who were not hotel guests.

170. Between 5 and 15 men who were not hotel guests went in and out of Plaintiff's room daily for the purpose of engaging in sex trafficking.

171. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

32

172. Housekeeping saw these men come in and out of the rooms.

173. Plaintiff's sex trafficker paid extra money in cash daily to hotel employees to receive extra sheets and towels for the room where Plaintiff was sex trafficked.

174. The general manager of the Extended Stay America directly participated in Plaintiff's sex trafficking.

175. Defendant Nelson made direct cash payments to the general manager of the Extended Stay America to facilitate and continue sex trafficking at the hotel.

176. Defendant Nelson's sex trafficking ended at the Extended Stay America after police visited the hotel on multiple occasions.

177. Defendant Nelson directed Plaintiff and another woman who was being sex trafficked to move to the TownePlace Suites by Marriott.

178. Because policies purportedly enacted and enforced by Extended Stay America to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Extended Stay America, Plaintiff's sex trafficker was able to continue the trafficking venture at the Extended Stay America.

179. If the Extended Stay America Defendants enforced the policies and procedures it enacted to prevent trafficking from occurring within their Extended Stay America-branded hotels after observing an obvious sign of trafficking as described above, then Plaintiff's trafficking would have been identified and reported, which would have prevented her trafficking at the Extended Stay America.

180. If the Extended Stay America Defendants properly followed the franchise policies enacted by Extended Stay America to identify and prevent trafficking from occurring at Extended

Stay America-branded hotels as described above, then Plaintiff's sex trafficking would have been identified and reported, which would have prevented her trafficking at the Ramada.

181. Despite obvious signs of sex trafficking and indicators of commercial sex activity, Extended Stay America Defendants failed to recognize, stop, or report the venture occurring on the premises that resulted in Plaintiff's trafficking and consequently, actively facilitated the trafficking venture.

182. The Extended Stay America Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, benefited, financially and otherwise, from the sex trafficking the Plaintiff suffered.

183. Furthermore, the Extended Stay America Defendants failed to prevent her continued victimization.

184. The Extended Stay America Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject Extended Stay America, despite the obvious signs of sex trafficking and commercial sex taking place because the Extended Stay America Defendants were actively engaged in the facilitation of and benefiting from said activities.

185. The Extended Stay America Defendants were in an agency relationship with the Extended Stay America-branded hotels offering public lodging services in the hotel. This agency relationship was created through the Extended Stay America Defendants' exercise of an ongoing and systemic right of control over Extended Stay America-branded hotels by the Extended Stay America Defendants; operations, including the means and methods of how Extended Stay America-branded hotels conducted daily business through one or more of the following actions:

a. Distributing information to assist employees in identifying sex trafficking;

34

b.     Providing a process for escalating sex trafficking concerns within the organization;

c.     Requiring employees to attend training related to sex trafficking;

d.     Providing new hire orientation on human rights and corporate responsibility;

e.     Providing training and education to Extended Stay America-branded hotels through webinars, seminars, conferences and online portals;

f.     Developing and holding ongoing training sessions on sex trafficking;

g.     Providing checklists, escalation protocols and information to property management staff; and

h.     Tracking performance indicators and key metrics on sex trafficking prevention.

186.    The Extended Stay America Defendants were in an agency relationship with Extended Stay America-branded hotels offering public lodging services in the hotel. This agency relationship was created through the Extended Stay America Defendants' exercise of an ongoing and systemic right of control over Extended Stay America-branded hotels by the Extended Stay America Defendants' operations, including the means and methods of how Extended Stay America-branded hotels conducted daily business through one or more of the following actions:

a.     Hosting online bookings on the Extended Stay America Defendants' domain;

b.     Requiring Extended Stay America-branded hotels to use the Extended Stay America Defendants' customer rewards program;

c.     Setting employee wages;

d.     Making employment decisions;

e.     Advertising for employment;

35

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 35 of 53

f.      Sharing profits;

g.      Standardized training methods for employees;

h.      Building and maintaining the facility in a manner specified by the owner;

i.      Standardized or strict rules of operation;

j.      Regular inspection of the facility and operation by the owner;

k.      Fixing prices; or

l.      Other actions that deprive Extended Stay America-branded hotels of independence in business operations.

187.    An apparent agency also exists between the Extended Stay America Defendants and the Extended Stay America-branded hotels. The Extended Stay America Defendants held out Extended Stay America-branded hotels to the public as possessing the authority to act on its behalf.

188.    Due to the Extended Stay America Defendants' control they assumed in educating, implementing and directing its branded hotels, including Extended Stay America-branded hotels, the Extended Stay America Defendants breached their duties in the following ways:

a.      Not adequately distributing information to assist employees in identifying sex trafficking;

b.      Failing to provide a process for escalating sex trafficking concerns within the organization;

c.      Failing to mandate managers, employees, or owners to attend training related to sex trafficking;

d.      Failing to provide new hire orientation on human rights and corporate responsibility;

     e.      Failing to provide training and education on sex trafficking through webinars, seminars, conferences and online portals;

     f.      Failing to develop and hold or require ongoing training sessions on sex trafficking; and

     g.      Failing to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on sex trafficking prevention.

189. The Extended Stay America Defendants knew or should have known that sex trafficking ventures were occurring on their properties, including the Extended Stay America property where Plaintiff was sex trafficked, but the Extended Stay America Defendants failed to take any steps to prevent and/or stop the sex trafficking of Plaintiff.

190. If the hotel staff were properly trained, the sex trafficking red flags would have been recognized and reported. But the Extended Stay America Defendants chose not to invest the time and resources to implement and execute any anti-sex trafficking programs and/or protocols.

191. Upon information and belief, the Extended Stay America Defendants demonstrated willful blindness to the rampant culture of sex trafficking, which tragically occurs on its Extended Stay America-branded properties throughout the country. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff at the Extended Stay America-branded hotel that forms the basis of this complaint.

**Plaintiff Jane Doe was Sex Trafficked at TownePlace Suites by Marriott**

192. From about April 2018 to about November 2018, Plaintiff was trafficked for sex at the TownePlace Suites by Marriott located at 1379 Washington Avenue, Albany, NY 12206.

193. Defendant Nelson openly sex trafficked Plaintiff at the TownePlace Suites.

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 37 of 53

194. Defendant Nelson rented two rooms at the TownePlace Suites, paying in cash, for the duration of the sex trafficking of Plaintiff.

195. Plaintiff's sex trafficker held two rooms at TownePlace Suites, one where the sex trafficking occurred and another where Plaintiff and the other victims of sex trafficking slept.

196. Other women were being trafficked at the same hotel at the same time as Plaintiff and she shared a room with other female victims of sex trafficking.

197. Defendant Nelson publicly advertised dates with Plaintiff on such websites as backpage.com.

198. Plaintiff accepted cash payments from the men with whom she was forced to engage in sexual acts with.

199. Defendant Nelson monitored the room where Plaintiff was sex trafficked and took the cash payment from Plaintiff and the other women whom he sex trafficked.

200. Defendant Nelson used force and engaged in a scheme, plan and pattern to compel and induce Plaintiff to engage in and continue to engage in prostitution activity by means of instilling fear in Plaintiff through acts of violence and threats of acts of violence.

201. Throughout the sex trafficking of Plaintiff at TownePlace Suites, Plaintiff was subjected to threats of violence and physical violence every few weeks, which included physical strikes and strangulation, by her sex trafficker, Defendant Nelson.

202. Defendant Nelson supplied Plaintiff and the other women who were sex trafficked with heroin and crack cocaine daily so that they continued to be sex trafficked.

203. Throughout the sex trafficking of Plaintiff at TownePlace Suites, Plaintiff was raped by her sex trafficker, Defendant Nelson, every few weeks.

204.     There was heavy foot traffic in and out of Plaintiff's room involving men who were not hotel guests.

205.     Between 5 and 10 men who were not hotel guests went in and out of Plaintiff's room daily for the purpose of engaging in sex trafficking.

206.     These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

207.     Housekeeping saw these men come in and out of the rooms.

208.     Plaintiff's sex trafficker paid extra money in cash daily to hotel employees to receive extra sheets and towels for the room where Plaintiff was sex trafficked.

209.     Plaintiff's sex trafficking ended at the TownePlace Suites when Plaintiff's sex trafficker left her unsupervised and she was able to escape from the hotel.

210.     Because policies purportedly enacted and enforced by the Marriott Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the TownePlace Suites, Plaintiff's sex trafficker was able to continue the trafficking venture at TownePlace Suites.

211.     If the Marriott Defendants enforced the policies and procedures it enacted to prevent trafficking from occurring within their TownePlace Suites-branded hotels after observing an obvious sign of trafficking as described above, then Plaintiff's trafficking would have been identified and reported, which would have prevented her trafficking at TownePlace Suites.

212.     If the Marriott Defendants properly followed the franchise policies enacted by TownePlace Suites to identify and prevent trafficking from occurring at TownePlace Suites-branded hotels as described above, Plaintiff's sex trafficking would have been identified and reported, which would have prevented her trafficking at TownePlace Suites.

213.    Despite obvious signs of sex trafficking and indicators of commercial sex activity, the Marriott Defendants failed to recognize, stop, or report the venture occurring on the premises that resulted in Plaintiff's trafficking and consequently, actively facilitated the trafficking venture.

214.    The Marriott Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and, accordingly, benefited, financially and otherwise, from the sex trafficking the Plaintiff suffered.

215.    Furthermore, the Marriott Defendants failed to prevent her continued victimization.

216.    The Marriott Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject TownePlace Suites, despite the obvious signs of sex trafficking and commercial sex taking place there because the Marriott Defendants were actively engaged in the facilitation of and benefiting from said activities.

217.    The Marriott Defendants were in an agency relationship with the TownePlace Suites-branded hotels offering public lodging services in the hotel. This agency relationship was created through the Marriott Defendants exercise of an ongoing and systemic right of control over TownePlace Suites-branded hotels by the Marriott Defendants; operations, including the means and methods of how TownePlace Suites-branded hotels conducted daily business through one or more of the following actions:

    a.    Distributing information to assist employees in identifying sex trafficking;

    b.    Providing a process for escalating sex trafficking concerns within the organization;

    c.    Requiring employees to attend training related to sex trafficking;

    d.    Providing new hire orientation on human rights and corporate responsibility;

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 40 of 53

e.    Providing training and education to TownePlace Suites-branded hotels through webinars, seminars, conferences and online portals;

f.    Developing and holding ongoing training sessions on sex trafficking;

g.    Providing checklists, escalation protocols and information to property management staff; and

h.    Tracking performance indicators and key metrics on sex trafficking prevention.

218.    The Marriott Defendants were in an agency relationship with TownePlace Suites-branded hotels offering public lodging services in the hotel. This agency relationship was created through the Marriott Defendants' exercise of an ongoing and systemic right of control over TownePlace Suites-branded hotels by the Marriott Defendants' operations, including the means and methods of how TownePlace Suites-branded hotels conducted daily business through one or more of the following actions:

a.    Hosting online bookings on the Marriott Defendants' domain;

b.    Requiring TownePlace Suites-branded hotels to use the Marriott Defendants' customer rewards program;

c.    Setting employee wages;

d.    Making employment decisions;

e.    Advertising for employment;

f.    Sharing profits;

g.    Standardized training methods for employees;

h.    Building and maintaining the facility in a manner specified by the owner;

i.    Standardized or strict rules of operation;

41

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 41 of 53

    j.      Regular inspection of the facility and operation by the owner;

    k.      Fixing prices; or

    l.      Other actions that deprive TownePlace Suites-branded hotels of independence in business operations.

219.     An apparent agency also exists between the Marriott Defendants and the TownePlace Suites-branded hotels. The Marriott Defendants held out TownePlace Suites-branded hotels to the public as possessing authority to act on its behalf.

220.     Due to the Marriott Defendants' control they assumed in educating, implementing and directing its branded hotels, including TownePlace Suites-branded hotels, the Marriott Defendants breached their duties in the following ways:

    a.      Not adequately distributing information to assist employees in identifying sex trafficking;

    b.      Failing to provide a process for escalating sex trafficking concerns within the organization;

    c.      Failing to mandate managers, employees, or owners to attend training related to sex trafficking;

    d.      Failing to provide new hire orientation on human rights and corporate responsibility;

    e.      Failing to provide training and education on sex trafficking through webinars, seminars, conferences and online portals;

    f.      Failing to develop and hold or require ongoing training sessions on sex trafficking; and

42

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML   Document 2   Filed 03/20/26   Page 42 of 53

g.      Failing to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on sex trafficking prevention.

221.    The Marriott Defendants knew or should have known that sex trafficking ventures were occurring on their properties, including the TownePlace Suites property where Plaintiff was sex trafficked, but the Marriott Defendants failed to take any steps to prevent and/or stop the sex trafficking of Plaintiff.

222.    If the hotel staff were properly trained, the sex trafficking red flags would have been recognized and reported. But the Marriott Defendants chose not to invest the time and resources to implement and execute any anti-sex trafficking programs and/or protocols.

223.    Upon information and belief, the Marriott Defendants demonstrated willful blindness to the rampant culture of sex trafficking, which tragically occurs on its TownePlace Suites-branded properties throughout the country. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff at the TownePlace Suites-branded hotel that forms the basis of this complaint.

## CAUSES OF ACTION

### AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION:
*(Sex Trafficking Under the TVPRA; All Defendants)*

224.    Plaintiff realleges and Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

225.    At all relevant times, Plaintiff was and is a victim within the meaning of 18 U.S.C. §§ 1591 and 1595(a).

226.    Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above:

a.      All Defendants knowingly or recklessly participated in harboring, maintenance and/or other acts in furtherance of sex trafficking, including the sex trafficking of Plaintiff; and

b.      All Defendants knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew, or were reckless in not knowing, involved the trafficking, harboring and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(1), 1593A.

227.    Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, all Defendants knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, *et seq.*

228.    Despite knowledge of Plaintiff's sex trafficking by the Defendants, Plaintiff's sex trafficker was able to continue renting rooms for the sexual exploitation and sex trafficking of Plaintiff.

229.    All Defendants participated in a venture together and with, among others, Plaintiff's trafficker. Despite the fact that Defendants knew or should have known that Plaintiff was being sex trafficked in violation of the TVPRA, Plaintiff's sex trafficker was able to continue renting rooms for the sexual exploitation and sex trafficking of Plaintiff. Plaintiff's sex trafficker frequently used the hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose: the rental of hotel rooms and the making of profits.

230.    All Defendants profited while Plaintiff's sex trafficker was able to rent a secure venue to earn profits by trafficking Plaintiff.

44

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 44 of 53

231.    All Defendants participated in the venture by continually renting rooms to Plaintiff's trafficker, failing to properly implement anti-trafficking rules and policies and assisting traffickers to continue their sexual exploitation and trafficking with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's sex trafficking.

232.    All Defendants' failures to train and supervise their agents and employees and their inattention to the plights of their patrons, including Plaintiff, enabled and contributed to the sex trafficking of Plaintiff.

233.    All Defendants received substantial financial benefits as a result of these acts and/or omissions.

234.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants received benefits in the way of management fees, royalty fees, reservation fees, marketing fees and other ancillary fees from the operation of the hotels.

235.    The Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels received benefits in the way of room rental fees, in-room purchases and other ancillary expenses by patrons and visitors of the hotels.

236.    All Defendants knowingly benefitted, financially or by receiving anything of value from participating in a venture that all Defendants knew or should have known was engaged in an act or acts in violation of the TVPRA.

237.    The acts and/or omissions of all Defendants were willful and malicious.

238.    The willful and malicious acts and/or omissions of all Defendants caused injuries to Plaintiff.

239.    As a result of the relationship between the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and the Ramada-, Extended Stay America- and

45

TownePlace Suites-branded franchise hotels, the Wyndham Defendants, that the Extended Stay America Defendants and the Marriott Defendants are vicariously liable for the acts of their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels. Factors that support this allegation are that the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants shared profits, standardized employee training, standardized and strict rules of operations, controlled pricing and reservations, regularly conducted inspections, provided operational support and control and other acts described above.

240.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants had the right to terminate any franchisee, including their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, that failed to comply with the requirements promulgated by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants. Thus, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants retained control, or the right to control, the mode and manner of work contracted for.

241.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants are vicariously liable for the acts and omissions of the staff because the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants, together with their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, acted as the joint employer of these employees because the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels jointly control the terms and conditions of their employment.

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 46 of 53

242.    The TVPRA violations, acts and omissions of all Defendants were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

243.    By reason of the foregoing, Defendants are liable for the damages set forth above.

**AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION:**
*(Sex Trafficking Under New York State's*
*Trafficking Victims Prevention Act; All Defendants )*

244.    Plaintiff realleges and Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

245.    At all relevant times, Plaintiff was and is a victim of the conduct prohibited by New York State Penal Law § 230.34(1) and (5).

a.    Defendants intentionally advanced or profited from prostitution by unlawfully providing to plaintiff who as patronized, with intent to impair said Plaintiff's judgment a narcotic drug or a narcotic; or

b.    Defendants intentionally advanced or profited from prostitution by using force or engaging in any scheme, plan or pattern to compel or induce Plaintiff to engage in or continue to engage in prostitution activity by means of instilling a fear in Plaintiff that, if the demand is not complied with, the actor or another will: cause physical injury, serious physical injury, or death to a person; cause damage to property, other than the property of the actor; engage in other conduct constituting a felony or Unlawful Imprisonment in the Second Degree in violation of Penal Law § 135.05; or performed acts that would not in itself materially benefit the actor but which is calculated to harm Plaintiff materially with respect to her health or safety.

246.    Defendants are liable as perpetrators within the meaning of New York State Social Services Law § 483-bb(c)(i) because Defendants knowingly advanced or profited from, or should

have known that they were advancing or profiting from, an act or acts in violation of New York State Penal Law § 230.34(1) and (5).

 a. All Defendants knowingly or recklessly participated in harboring, maintenance and/or other acts in furtherance of sex trafficking, including the sex trafficking of Plaintiff; and

 b. All Defendants knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring and maintenance of sex trafficking victims in exchange for financial benefits.

247. All Defendants knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of New York State Penal Law § 230.34(1) and (5).

248. Despite knowledge Plaintiff's sex trafficking by the Defendants, Plaintiff's sex trafficker was able to continue renting rooms for the sexual exploitation and sex trafficking of Plaintiff.

249. All Defendants participated in a venture together and with, among others, Plaintiff's trafficker. Despite the fact that all Defendants knew or should have known that Plaintiff was being sex trafficked in violation of New York State Penal Law § 230.34(1) and (5), Plaintiff's sex trafficker was able to continue renting rooms for the sexual exploitation and sex trafficking of Plaintiff.

250. Plaintiff's sex trafficker frequently used the hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose: the rental of hotel rooms and the making of profits.

251. All Defendants profited while Plaintiff's sex trafficker was able to rent a secure venue to earn profits by trafficking Plaintiff.

252. All Defendants participated in the venture by continually renting rooms to Plaintiff's trafficker, failing to properly implement anti-trafficking rules and policies and assisting traffickers to continue their sexual exploitation and trafficking with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's sex trafficking.

253. All Defendants' failures to train and supervise their agents and employees and their inattention to the plights of their patrons, including Plaintiff, enabled and contributed to the sex trafficking of Plaintiff.

254. All Defendants received substantial financial benefits as a result of these acts and/or omissions. The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants received benefits in the way of management fees, royalty fees, reservation fees, marketing fees and other ancillary fees from the operation of the hotels.

255. The Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels received benefits in the way of room rental fees, in-room purchases and other ancillary expenses by patrons and visitors of the hotels.

256. All Defendants knowingly benefitted, financially or by receiving anything of value from participating in a venture that Defendants knew or should have known had engaged in an act or acts in violation of New York State Penal Law § 230.34(1) and (5) and Social Services Law § 483-bb(c).

257. The acts and/or omissions of all Defendants were willful and malicious.

258. The willful and malicious acts and/or omissions of all Defendants caused injuries to Plaintiff.

49

259.    As a result of the relationship between the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants are vicariously liable for the acts of their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels. Factors that support this allegation are that the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants shared profits, standardized employee training, standardized and strict rules of operations, controlled pricing and reservations, regularly conducted inspections, provided operational support and control and other acts described above.

260.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants had the right to terminate any franchisee, including their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, that failed to comply with the requirements promulgated by the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants. Thus, the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants retained control, or the right to control, the mode and manner of work contracted for.

261.    The Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants are vicariously liable for the acts and omissions of the staff because the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants, together with their Ramada-, Extended Stay America- and TownePlace Suites-branded franchise hotels, acted as the joint employer of these employees because the Wyndham Defendants, the Extended Stay America Defendants and the Marriott Defendants and their Ramada-, Extended Stay America- and

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 50 of 53

TownePlace Suites-branded franchise hotels jointly control the terms and conditions of their employment.

262. The acts and omissions of all Defendants were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

263. By reason of the foregoing, Defendants are liable for the damages set forth above.

## DEMAND FOR JURY TRIAL

Plaintiff herein demands a trial by jury for all issues in this action.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff respectfully prays for a Judgment against Defendants as follows:

i. Awarding Plaintiff compensatory damages for mental, emotional, psychological and physical injuries, distress, pain and suffering and for injury in an amount to be determined at trial but in any case, no less than stated above;

ii. Awarding Plaintiff punitive damages to be determined at trial;

iii. Awarding Plaintiff reasonable attorney fees, litigation expenses and costs incurred in bringing this action; and

iv. Such other relief as this Court deems appropriate and just under the circumstances.

Dated: February 2, 2026
New York, New York

Respectfully submitted,

Andrew M. Stengel
*Attorneys for Plaintiff*
The Law Firm of Andrew M. Stengel, P.C.

51

11 Broadway, Suite 715
New York, NY 10004
Tel: (212) 634-9222
Fax: (212) 634-9223
E-mail: andrew@stengellaw.com

52

FILED: RENSSELAER COUNTY CLERK 02/09/2026 02:31 PM
INDEX NO. EF2026-282116
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/09/2026

Case 1:26-cv-00443-MAD-ML    Document 2    Filed 03/20/26    Page 52 of 53

## VERIFICATION

STATE OF NEW YORK    )
                ) ss.:
COUNTY OF RENSSELAER)

████████████, being duly sworn, deposes and says:

I am the plaintiff Jane Doe in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Sworn to before me this

9th day of February 2026

_____
Notary Public

SARAH SCHIFFRES
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SC6425979
QUALIFIED IN RENSSELAER COUNTY
MY COMMISSION EXPIRES DECEMBER 6, 2029

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RENSSELAER
-------------------------------------------------------------------x
JANE DOE,

                     Plaintiff,

-against-                                   Index No.

SUPER HOST HOTELS, INC. d/b/a RAMADA PLAZA
BY WYNDHAM, WYNDHAM HOTELS & RESORTS,
INC., CORPORATION 123 d/b/a RAMADA PLAZA
BY WYNDHAM, EXTENDED STAY AMERICA,
INC., ESA MANAGEMENT, LLC d/b/a EXTENDED
STAY AMERICA, CORPORATION 456 d/b/a
EXTENDED STAY AMERICA, MARRIOTT
INTERNATIONAL, INC., MARRIOTT HOTEL
SERVICES, INC., W2005/FARGO HOTELS REALTY,
L.P. d/b/a TOWNEPLACE SUITES BY MARRIOTT,
CORPORATION 789 d/b/a TOWNEPLACE SUITES
BY MARRIOTT AND HAROLD NELSON,

                     Defendants.
-------------------------------------------------------------------x

===================================================================

SUMMONS AND VERIFIED COMPLAINT

===================================================================

       Pursuant to 22 NYCRR 130-1.1, the undersigned, attorneys admitted to practice in the courts of New York State, certify that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated: February 2, 2026

                                         Andrew M. Stengel, Esq.

                  The Law Firm of Andrew M. Stengel, P.C.
                          11 Broadway, Suite 715
                          New York, NY 10004
                          Tel: (212) 634-9222
                          Fax: (212) 634-9223
                          andrew@stengellaw.com